# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISCANDER MADRIGAL,<br><br>          Petitioner,<br><br>     v.<br><br>JEFF MACOMBER,<br><br>          Respondent. | Case No. 1:14-cv-01436-LJO-SAB-HC<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF AMENDED PETITION FOR WRIT OF HABEAS CORPUS<br><br>(ECF No. 33) |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

On June 28, 2011, Petitioner was convicted after a jury trial in the Kings County Superior Court of first-degree murder. (1 CT[1] 234). The jury also found that the murder was committed to further the activities of a criminal street gang and that Petitioner personally and intentionally discharged a firearm causing death. (1 CT 234–35). Petitioner was sentenced to life without the possibility of parole plus twenty-five years to life. (2 CT 318). On June 5, 2013, the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Madrigal, No. F062969, 2013 WL 2450922, at *14 (Cal. Ct. App. June 5, 2013). The California Supreme Court denied Petitioner's petition for review on August 21, 2013. (LDs[2] 20, 21).

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on January 28, 2015. (ECF No. 19).
[2] "LD" refers to the documents lodged by Respondent on January 28, 2015 and August 22, 2016. (ECF Nos. 19, 41).

Thereafter, Petitioner filed a state petition for writ of habeas corpus in the Kings County Superior Court, which denied the petition on March 12, 2014. (LDs 22, 23). Petitioner filed a state habeas petition in the California Court of Appeal, Fifth Appellate District, which denied the petition on May 15, 2014. (LDs 24, 25). Petitioner then filed a state habeas petition in the California Supreme Court, which denied the petition on August 13, 2014. (LDs 26, 27).

On September 15, 2014, Petitioner filed a federal petition for writ of habeas corpus in this Court challenging his 2011 murder conviction. (ECF No. 1). On September 17, 2015, the Court granted Petitioner's motion to amend the petition to withdraw claim 4, the ineffective assistance of counsel claim, and granted Petitioner's motion to stay this matter pursuant to Kelly v. Small, 315 F.3d 1063 (9th Cir. 2002), pending exhaustion of state remedies. (ECF No. 29). On October 19, 2015, Petitioner filed a state petition for writ of habeas corpus in the California Supreme Court, which denied the petition on February 3, 2016. (LDs 28, 29).

On April 11, 2016, the Court lifted the stay and granted Petitioner's motion to amend the petition to include the newly exhausted ineffective assistance of counsel claim. (ECF No. 35). In the amended petition, Petitioner raises the following claims for relief: (1) erroneous admission of Detective Buhl's testimony, in violation of the Confrontation Clause and due process; (2) erroneous admission of confidential informant Garcia's recording and testimony, in violation of the Fourth Amendment and due process; and (3) ineffective assistance of trial counsel. (ECF No. 33). Respondent has filed an answer, and Petitioner has filed a traverse. (ECF Nos. 38, 43).

**II.**

**STATEMENT OF FACTS[3]**

**Facts Relating to the Murder**

On May 22, 2010, at approximately 11:00 p.m., Juan Zavala and his girlfriend Daniella Rizo went to the Circle K to purchase some medicine. Zavala went into the store while Rizo waited outside in the parking lot in the driver's seat of her white Explorer, listening to the radio. There was a white Mustang parked a few spaces over from the Explorer with three people inside. While in the store, Zavala did not notice any problems between any of the customers. Zavala exited the store without making a purchase and went to speak with Rizo in the parking lot. He was about to go back into the store when he noticed some arguing between one of the

---

[3] The Court relies on the California Court of Appeal's June 5, 2013 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

2

men from the Mustang and someone from another car that was parked next to the Mustang. Zavala wasn't paying much attention to the argument as he did not want to become involved. He did notice that the man from the Mustang was standing on the passenger side of the car while the person he was arguing with was standing on the other side of the car. Zavala heard a shot and the man on the passenger side of the Mustang fell to the ground while the people in the other car sped off. The man, later identified as Luis Meza, died. Zavala had not seen any weapons.

Rizo testified that as Zavala was going back into the store, she heard a loud noise and then something hit her vehicle. She looked over and saw a man fall to the ground as a red car sped off. She also noticed that the back passenger's and driver's windows on her Explorer were now broken.

Victor Arellano was working the night shift at Circle K on the evening of the murder. He explained that he had parked his truck in a parking stall in front of the store. During his shift, a small red car parked in the stall to the right of his truck in front of the store. The white Mustang was in the stall to the right of the red car. Arellano had noticed a man exit the passenger side of the red car and enter the store. He identified this man as defendant. Defendant was wearing a white shirt with red sleeves.

Inside the store, defendant selected several items of candy and ultimately purchased a king-size Reese's candy bar. After making the purchase, defendant hurried out of the store while Arellano helped another customer. Arellano heard a loud pop coming from the parking lot, looked out, and saw two cars rapidly exiting the parking lot. One was a small red car, the other was a gray car that had been parked behind the red car and a white Mustang. He called 911 and went outside where he noticed the victim lying on the ground bleeding. The victim was on the passenger side of the white Mustang.

Arellano explained that the store had a video surveillance system, and two videos from the night of the murder were played for the jury. The first video was of the area near the register and depicted a number of customers inside the store. Arellano identified the victim entering the store wearing a black suit with white patches on the shoulders. He stated the victim had arrived in the white Mustang. While the victim was still inside the store, defendant arrived in the red car. Defendant entered the store while the victim was still inside. The victim left the store prior to defendant. Just after the victim left the store, a regular customer entered the store. The man was wearing a gray jacket. This was the man driving the gray car which was parked behind the white Mustang and the red car, blocking the Mustang and partially blocking the red car. While inside the store, defendant spoke to a man with sunglasses on his head, later identified as Christian Lopez. It appeared as if Lopez was waiting for defendant in the store. Defendant left the store after making his purchase. Arellano heard the loud pop shortly thereafter while he was helping the next customer.

The second video showed the inside of the store looking out into the parking lot. On the video, the white Mustang is parked in front of the store when the red car arrived and parked next to it. Defendant exited the passenger side of the red car and entered the store. Later, the victim left and the man driving the gray car parked behind the Mustang and the red car and entered the store. Shortly thereafter, defendant and Lopez left the store, and defendant appeared to enter the passenger side of the red car. When Arellano heard the pop, he looked up and saw the red car leave first, followed by the gray car.

Jennifer Machado, a Kings County Sheriff's Deputy, was dispatched to a call of shots fired at 11:38 p.m. She arrived at the Circle K within 20 to 30 seconds of the dispatch. Upon arrival, she noticed the victim with a gunshot wound to his chest, lying on his back next to the passenger side of the white Mustang. Although his eyes were open, he had no pulse and was not moving. She secured the scene and searched the area. She did not find any weapons at the scene or near the victim, however, she did not search any people at the scene. She noticed the white Explorer had a bullet hole in each of the two rear windows and the glass was broken.

Kings County Sheriff's Deputy Trevor Lopes responded to the murder, finding a slug in a home across the street from the Circle K. He assisted in preparing a crime scene diagram and noted the Explorer was separated from the white Mustang by one parking stall. Kings County Sheriff's Detective David Morrell found a nine-millimeter shell casing at the scene in the parking lot. This item was submitted for fingerprint analysis, however, no prints were found on the casing. Using a string through the two holes in the Explorer's windows, the detective attempted to trace the bullet's trajectory. He determined the trajectory was consistent with where the slug was found in the house across the street. He also searched the victim's body and found no weapons, however, he did not search any of the people at the scene.

Kings County Sheriff's Deputy Rachel Moroles assisted in the homicide investigation. On May 23, 2010, at approximately 6:30 a.m. she arrived at Lopez's home in Coalinga and found a red Honda. She found a king-size Reese's peanut butter candy wrapper on the passenger side floorboard of the car.

Coalinga police officer Amy Freeman testified that on May 10, 2010, she contacted Lopez regarding a possible burglary. During a search of his car, she found a loaded nine-millimeter gun magazine.

Kings County Sheriff's Deputy Chris Fernandes identified victim Meza. Meza had the moniker of "Camaron," meaning "Shrimp." Meza was later determined to be an active Sureno gang member.

Dr. Burr Hartman, a forensic pathologist, examined the victim's body and determined the cause of death was a gunshot wound to the chest that went through the heart and severed the left pulmonary artery, causing the victim to bleed to death. The bullet went through the victim's body entering just above the left nipple and exiting the left side of his back. During the examination of the victim's body, Dr. Hartman noticed a "13" tattoo on the web of the thumb on the victim's right hand, as well as the words "Huron" and "South Side" on his back. According to a toxicology report, the victim had a large amount of methamphetamine in his system at the time of his death, indicating he had used within hours of his death.

Defendant and Lopez were both arrested at the home of Steven "Tank" Murrieta in Reedley on May 25, 2010.

**Testimony Regarding Defendant's Statements Following the Murder**
Two witnesses testified regarding statements defendant made to them shortly after the murder. The first witness was Julian Salinas, who at the time of trial was a

dropout from the Norteno[4] street gang. In August of 2010, after he was arrested on unrelated charges, Salinas stated he had information regarding a murder. At trial, Salinas recounted a conversation he had with defendant and Lopez the morning after the murder.

At the time of the conversation, Salinas had known Lopez for approximately 10 years and had been close friends with him. He also knew defendant, "because we right there in Coalinga, the northerners and everything, we hang around." Lopez introduced defendant to Salinas. Lopez had the moniker "Chino" and "C–Lo" and defendant's moniker was "Bam Bam."

On May 23, 2010, sometime between 7:00 and 8:00 a.m., Salinas received a telephone call from Lopez asking him to bring him some methamphetamine. Shortly thereafter, "Grumpy" or "Grumps," a Norteno associate, arrived and picked up Salinas. Salinas obtained the drugs and went to Grumps's apartment in Coalinga where he met defendant and Lopez. Grumps's girlfriend was present at the home as well. Both defendant and Lopez looked "spooked," and defendant told him that they had shot a "scrap." "Scrap" is a derogatory term for a Sureno[5] gang member. At first, Salinas did not believe them, but then saw their pictures on the television and heard the news story that they were wanted for a homicide. Defendant told Salinas that while in the store, the victim started "tripping" on defendant and that the victim was going to call more people, so defendant just shot him. There had been an argument between the victim and defendant over "gang stuff." To the best of Salinas's knowledge, the argument was about the victim or one of his associates shooting Lopez's car approximately one week earlier. In the gang culture, one would not report such an incident to police; rather, one would simply retaliate. The appropriate level of retaliation would be to shoot up the house or to kill the person.

Salinas testified that Lopez had showed him two guns, a .357 revolver and a nine-millimeter handgun and said they were going to get rid of them. In addition, Lopez and defendant had talked about burning their clothes and shoes and waiting for someone to pick them up to drive them out of town or out of state. They also explained that they had dropped off Lopez's red Honda at his mother's house in Coalinga.

Cesar Garcia was an active Varrio East Side Reedley Norteno gang member in 2010. He became a member of the gang at age 13 and used the moniker "Huero." In 2010, Garcia decided he wanted to leave the gang, and in doing so, he began working with law enforcement to help dismantle the gang. In May of 2010, Garcia received a telephone call from Tank, a fellow Norteno gang member, advising him there were two men at his home claiming to be Nortenos from Huron and stating they had murdered a Sureno. As Garcia was a high-ranking individual within the gang, he was tasked with investigating any newcomers to be sure they were not police infiltrators. Prior to going to Tank's home, Garcia activated a digital recording device and recorded his conversation with the two men.

At the house, Garcia met defendant, who introduced himself as Bam Bam, and another man who called himself Chris and also used the moniker Chino. There

---

[4] The terms Norteno and northerner and north-sider were used interchangeably at trial. For ease of reference, we will simply use the term Norteno.

[5] The term Sureno was used interchangeably at trial with the terms southerner and south-sider. For ease of reference, we will simply use the term Sureno.

were approximately eight to 12 active Norteno gang members at the house at the time. The men explained that they had just murdered a Sureno at a gas station, that the murder was caught on camera, and that they were trying to leave the area. The murder had occurred one to two days prior to the conversation.

The tape of the conversation was played for the jury.

On the tape, defendant told Garcia that he was from Huron and that he had "murked a scrapa" and had been caught on camera committing the crime. Garcia explained that "murked" meant murdered. Defendant explained that while in the store,

> "that skrapa started tripping homie so were like fuck this nigga you know and when we were walking out this skrapa was still right there homie & he ficken called a grip of skraps homie & before that bro like two weeks before that he shot up all the car homie gacho like sprayed it homie no windows nothing sprayed it bro so we were fuck these niggas as soon that [¶] ... [¶] ... as soon that fool tried to run up we were already inside the car I told this fool to turn around fool that fool tried to run up again ta ta pa that fool pa." (Capitalization omitted.)

Garcia explained that a "grip" means a lot, "gacho" means messed up and "sprayed" means shooting a lot of bullets. In addition, when defendant said that "when that fool tried to run up," it meant that the victim was trying to engage in battle with him. Defendant went on to say he only shot the victim once with a nine-millimeter while defendant was inside the vehicle. The incident began when the victim was "wolfing" or "talking shit" towards defendant. According to defendant, another car with approximately six people arrived just before the shooting. This would be consistent with someone calling in a "grip."

After the shooting, the duo dropped the car off at Lopez's mother's house and disposed of the gun and their clothes and shoes. Defendant admitted in the conversation that he was in gang files, meaning he was a validated gang member. Garcia gave the men clothes and shoes and allowed them to stay at Tank's house. He did so because as a gang member he was obligated to help out a fellow gang member avoid detection from the police.

Garcia explained that in the gang culture, if a Sureno shoots a Norteno's car, the Norteno is expected to retaliate by killing the Sureno. The goal is to kill rival gang members. This is what defendant was discussing with him in the conversation. Killing a Sureno would benefit the Norteno gang.

According to Garcia, being a gang member is a "life-style, it's like you're [*sic*] job.... You go put in work, meaning you go find a rival gang member and ... you try to inflict violence towards them." "Putting in work" means committing an act of violence toward the rival gang. The whole purpose of the Norteno gang is to intimidate Surenos, to make them stop "banging" and to do violence upon them. Committing violence against the rival gang will get a gang member recognized. However, taking credit for someone else's crime is against the rules. The Nortenos are a very structured gang, providing a code of conduct by which its members must abide.

### Gang Evidence

Officer Santiago Jurado worked with the Huron Police Department during 2010. Jurado has known defendant since 2005 or 2006 and has had numerous personal

contacts with him both contacting and arresting him on several occasions. Based on his personal experience with defendant, Jurado testified that defendant was a member of the Norteno street gang in 2010 and uses the gang moniker Bam Bam. Gang members use a moniker or nickname in lieu of using their given name to conceal their identity from law enforcement. He further testified Lopez was a friend of defendant and was also a Norteno gang member. Jurado was also familiar with the victim Meza through several contacts and arrests for possessing an open container and being drunk in public. Meza was a Sureno gang member and had the moniker Camaron.

Fresno Police Department Detective Kyle Kramer is assigned to the Multi Agency Gang Enforcement Consortium task force. As part of his duties, he collects and documents information about gang members and their activities on field identification cards. Kramer is familiar with Cesar Garcia through his gang investigations. Garcia was an influential member of the Varrio East Side Reedley criminal street gang, a subset of the Norteno gang. During February of 2010, Kramer met with Garcia regarding Garcia's desire to leave the gang. Garcia expressed a willingness to become an informant and, in fact, worked as an informant from February until November of 2010, when he was placed in witness protection. Garcia received monetary compensation while working as an informant. In addition, arrangements were made to lift a parole hold on Garcia at one point.

Detective Kramer explained there are primarily three gangs in Huron, the Nortenos, the Surenos and the Bull Dogs. Huron Park Side as well as Varrio East Side are both subsets of the Norteno gang. Subsets are part of the larger gang except they tend to use variations on the gang name. However, they all use the same colors, numbers, and symbols of the gang.

Detective Charles Buhl with the Kings County Sheriff's Department testified as an expert regarding gangs and gang culture. He explained that the Norteno street gang, under the name Nuestra Familia, began in prison in the 1960's to protect themselves from the Surenos, known at the time as the Mexican Mafia. The Nortenos associate with the number 14, which represents "N," the fourteenth letter of the alphabet, and the color red. Common symbols used by the Nortenos are one dot followed by four dots to represent the number 14, or the Roman numeral "X" followed by the number 4 or four dots with two lines underneath also representing the Aztec number 14. The gang and its members also use a northern star as a symbol of the gang.

Gang membership is divided into three categories: the "wannabe" or distant admirer, the associate who "walks like it, talks like it, is willing to do crimes to be accepted," and the actual gang members who "walk like it, they talk like it, they have either been to prison, they got a lot of respect, they put in a lot of work, they've got the tattoos, they've got the moniker." "Putting in work" means committing crimes or going on missions for the gang. Gang members will "fly colors" or show the color of their gang as well as have prominent tattoos to announce their presence. Gang members get respect through spreading fear and intimidation. The more a person is feared, the more respect they have within the gang. As a result, those members are looked up to by other gang members and get certain benefits.

The primary activities of the Norteno street gang are murder, attempted murder, arson, vehicle theft, narcotics trafficking, robbery, burglary, driveby shootings, and felony assault. The Norteno and Sureno gangs are rivals. The gangs are

always engaged in conflicts with each other. These conflicts usually escalate from minor fights to homicides. Gang members are always expected to retaliate against their rivals with escalating force, and the failure to do so is perceived as a weakness. Gang members will help other gang members with hiding places, even if they are from other counties.

Detective Buhl reviewed the gang contacts and prior convictions of three Norteno gang members: Giovanni Miranda, Carlos Basulto, and Julio Enriquez. After reviewing and detailing their prior contacts, Buhl opined that each was an active Norteno gang member and had committed specific crimes for the benefit of that gang. The documents demonstrating the convictions for these three men were also admitted into evidence. Specifically, Buhl testified that in December of 2005, a school was broken into. Items were taken and gang graffiti was left behind. Miranda, Basulto, and defendant were identified as the perpetrators, with both defendant and Miranda admitting involvement in the break-in.

Detective Buhl opined that Lopez was a Norteno gang member based on some specific contacts Lopez had with law enforcement. Specifically, Lopez associated with other known gang members, chased rival gang members while yelling gang slurs, and burned a porch belonging to a rival gang member. In addition, he noted Lopez had gang-related tattoos.

Detective Buhl also reviewed reports and spoke to other law enforcement officers regarding defendant. He briefly recounted seven specific incidents that he considered gang contacts regarding defendant, which are described more fully below. He also reviewed photos of defendant depicting his tattoos. Buhl explained that defendant had numerous tattoos indicating his gang membership, including tattoos of one dot and four dots on his hands, a tattoo of a northern star on his calf, a tattoo of Huron Park Side on his forearm, "Norte" on his chest and tattoos of "X" and "4" on his arms. Huron Park Side is a subset of the Norteno gang. Based on this information, Buhl opined defendant was a member of the Norteno street gang.

After speaking with other officers and the family members of the victim as well as reviewing specific law enforcement contacts, Detective Buhl opined the victim was an active Sureno gang member. The victim's tattoos were also indicative of his Sureno gang membership. The Sureno gang is an extremely violent gang with the primary purpose of eradicating Nortenos.

The detective opined that a Norteno who was wearing a red and white shirt, who was riding in a red car, who ran into a Sureno with whom he had a history in a parking lot of a minimart, and who shot the Sureno after exchanging looks and words, committed the shooting for the benefit of the Norteno gang. This act would benefit the gang by showing the strength of the Norteno gang and also by removing a rival gang member from the street. Committing the shooting while wearing red would advertise that the shooting was committed for the benefit of the gang. In addition, if the person later talked about "murking a scrap," it advertises the shooting was committed for the gang, and demonstrates knowledge the victim was a member of the rival gang. Committing the crime in the presence of another Norteno gang member further demonstrates the crime was to benefit the gang. Based on the facts he reviewed, the detective had no doubt about his opinion that the crime was committed for the benefit of the Norteno street gang.

**Defense Evidence**

Socorro Rebolledo was dating Jorge Marquez (Grumpy) in 2010. On May 23, 2010, she and Marquez visited a family member at a hospital. She denied ever seeing either defendant, Lopez or Salinas on that date, or meeting with the three at her apartment. She did not know if Marquez was a Norteno gang member. Marquez testified he visited his sister in the hospital on the evening of May 22, 2010. He was home all day the next day and no one came over to his home. He denied that defendant, Lopez and Salinas came to his apartment.

Kings County Sheriff's Deputy Robert Balderama testified he assisted in processing the red Honda recovered from Lopez's mother's home for gunshot residue. After collecting the kit, he provided it to the lead investigator.

The parties stipulated that a defense investigator attempted to serve a subpoena on Murrieta in Reedley but was unable to locate him.

Madrigal, 2013 WL 2450922, at *1–7 (footnotes in original).

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of Kings County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

1   28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538

2   U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

3          As a threshold matter, this Court must "first decide what constitutes 'clearly established

4   Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71

5   (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this

6   Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

7   of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words,

8   'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

9   set forth by the Supreme Court at the time the state court renders its decision." Id. In addition,

10  the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal

11  principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

12  . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of

13  review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v.

14  Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

15  Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an

16  end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552

17  U.S. at 126; Moses, 555 F.3d at 760.

18         If the Court determines there is governing clearly established Federal law, the Court must

19  then consider whether the state court's decision was "contrary to, or involved an unreasonable

20  application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C.

21  § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the

22  state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

23  of law or if the state court decides a case differently than [the] Court has on a set of materially

24  indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The

25  word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character

26  or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New

27  International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to

28  [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the

governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

///

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

**IV.**

**REVIEW OF CLAIMS**

**A.  Detective Buhl's Testimony**

In his first and second claims for relief, Petitioner asserts that the admission of gang expert Detective Buhl's testimony regarding Petitioner's prior gang contacts violated the Confrontation Clause and his due process rights. (ECF No. 33 at 4).[6] Respondent argues that the state court's rejection of these claims was not contrary to, or an unreasonable application of, clearly established federal law. (ECF No. 38 at 22–23).

Petitioner raised these claims challenging Detective Buhl's testimony on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claims in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield v. Cain, 135 S. Ct. 2269, 2276 (2015); Johnson v. Williams, 133 S. Ct. 1088, 1094 n.1 (2013); Ylst, 501 U.S. at 806.

---

[6] Page numbers refer to ECF page numbers stamped at the top of the page.

In denying Petitioner's claims challenging the admission of Detective Buhl's testimony of Petitioner's prior gang contacts, the California Court of Appeal stated:

> At trial, "gang contacts" were referred to by a number. The issue of defendant's prior specific contacts with police was discussed three times. The first was during an in limine conference where defendant objected to gang contact numbers 5, 6, 8, 9 and 11 "under level hearsay."[7] The second discussion about defendant's gang contacts occurred during the initial direct examination of Detective Buhl. Defendant objected as the detective was recounting a specific gang contact regarding Giovanni Miranda, which ultimately was the same contact as contact number 5 involving defendant. During a sidebar, defendant clarified that the objection was on hearsay and *Crawford* (*Crawford v. Washington* (2004) 541 U.S. 36) grounds as to that particular contact. The final discussion regarding this testimony occurred immediately before Buhl resumed his testimony, at which time defendant objected specifically to three contacts involving defendant. After the court ruled the contacts were admissible, defendant lodged a hearsay objection on the record to each of the contacts during the testimony.
>
> The contacts which were ultimately recounted to the jury were as follows.
>
> Contact number 2 occurred on March 1, 2006, and involved defendant confronting his mother regarding her speaking to a rival gang member's mother about a bike theft. Defendant slapped his mother, wielded an aluminum bat at her, and left the home. There was never an objection to this testimony on the record.
>
> Contact number 3 occurred on the same day. Defendant, with other Norteno gang members, was contacted by Huron police officers near fresh graffiti indicating Norteno association. Officers found an aluminum bat, spray paint, and beers nearby. There was no objection to this testimony.
>
> Contact number 5 occurred on July 26, 2006, and involved a report that defendant along with Giovanni Miranda and others assaulted a victim with rocks, bricks, and a bike peg. The victim was unsure of who actually hit him. The victim reported the attackers stated, "Hey, scraps, you want some problems" during the assault. The statement was uttered by Miranda, not defendant. Defendant objected to this testimony. This same contact was also recounted regarding Miranda's gang contacts.
>
> Contact number 6 occurred on October 4, 2006, where Huron police officers responded to a vandalism report. The victim claimed defendant had thrown rocks at his vehicle. Defendant was later arrested and admitted to being a Norteno and to knowing the victim was a Sureno. The victim further reported the problem was over the rival gang association of the two. Defendant objected to this testimony.
>
> Contact number 10 occurred on December 2, 2007, when Huron police officers responded to a complaint of a bike theft. The victims reported that defendant along with others stole a bicycle. During the ordeal, defendant reached for a bulge in his pocket, simulating that he had a firearm, and stated he would shoot them. When defendant was arrested, he admitted he was a Norteno gang member and that he took the bicycle. The victims had laughed at him and he wanted to

---

[7] The prosecution ultimately did not produce evidence of contacts 8 and 9. Counsel went on to object to another contact, number 13, based specifically on its reliability and prejudice grounds. That contact also was never provided to the jury.

intimidate them because he is a Norteno and the victims were Surenos. He also called the victims "bitch ass scraps." He admitted he liked using fear and intimidation to his advantage. There was no objection to this testimony.

Contact number 11 occurred on January 19, 2010, and involved a Huron police officer responding to a claim that a victim was assaulted with a two-by-four. The victim identified defendant as one of his attackers. According to the victim, defendant stated, "What do you bang, this is Norte?" He further stated "this is Bam Bam, I'll get you on the streets." Defendant objected to this testimony.

The final contact was contact number 12, occurring on January 24, 2010. According to a police report, defendant was a passenger in a vehicle stopped for a traffic violation. Officers noted defendant was wearing a red sweatshirt during the contact and there were some ski masks in the vehicle. Officers documented a number of defendant's tattoos with photographs. There was no objection to this testimony.

Initially, we find that defendant has failed to preserve any claim of error regarding contact numbers 2, 3, 10, and 12. Defendant never objected to any of these contacts, rather, counsel specifically limited her objections to the testimony as to contacts numbers 5, 6, and 11. Defendant contends trial counsel objected to "the gang contacts testimony of the gang expert" and specifically objected to "the admission of multi-layered hearsay contained in Officer Buhl's STEP Act Report of gang contacts concerning [defendant's] participation in gang criminal activity." However, the record does not support defendant's claim that he objected to each of the gang contacts. Rather, the record discloses defendant only objected to three contacts.

During trial, and prior to resuming Detective Buhl's testimony, defendant's counsel placed hearsay objections to some of the anticipated testimony on the record. After a discussion with the prosecutor regarding exactly which contacts were going to be used as a basis for Buhl's testimony, defendant's counsel specifically objected to only three of those contacts, numbers 5, 6, and 11. Indeed, counsel expressly noted she was not objecting to at least two of the other contacts.[8] Thus, it is clear that these were the only contacts complained of at the trial level. This conclusion is supported by the fact counsel only objected to these same contacts during the trial testimony. As defendant never objected at trial to the admission of the remainder of the testimony, he is precluded from raising the objection for the first time on appeal. (Evid.Code, § 353; *People v. Alvarez* (1996) 14 Cal.4th 155, 186 [confrontation clause claim not preserved for appeal without timely and specific objection]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1118 [confrontation clause claim waived absent objection].)

---

[8] Counsel stated she had "no basis" to object to contact number 10 as that recounted defendant's own statements. Further, she noted no objection to number 12 except for any comment on deportation, which the prosecutor agreed not to discuss.

Defendant's counsel did object once during Detective Buhl's initial testimony when he was recounting prior gang contacts involving Giovanni Miranda. Counsel lodged a hearsay and *Crawford* objection when the detective was recounting the contact on July 26, 2006. This contact is the same as contact number 5 recounted above. Again, it is clear from the record that defendant's objection was limited to only that contact. Indeed, counsel explained that the "objection is that *this contact that the expert is describing* is at least double hearsay under the *Crawford* decision and under the decisions in *In Re Nathaniel C.,* and in *People versus Gardeley ....*" (Italics added.)

As to the challenged testimony, defendant argues the admission of the testimony violated the confrontation clause. He reasons that the hearsay statements consisted of testimonial statements offered for their truth without an opportunity to cross-examine the declarant in violation of *Crawford v. Washington, supra,* 541 U.S. 36. Plaintiff argues the statements were not offered for their truth but, rather, were offered as a basis for the expert's opinion and therefore do not fall under the class of statements governed by *Crawford.* Indeed, defendant recognizes his argument has been rejected in *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1210, which held that an expert may rely on hearsay in forming the basis of an opinion and may relay that hearsay to the trier of fact in explaining the foundation for that opinion. This holding has been consistently followed by the California appellate courts. (*People v. Hill* (2011) 191 Cal.App.4th 1104 [following the rule in *Thomas* although disagreeing with its reasoning]; *People v. Sisneros* (2009) 174 Cal.App.4th 142; *People v. Ramirez* (2007) 153 Cal.App.4th 1422; *People v. Cooper* (2007) 148 Cal.App.4th 731; see *People v. Gardeley* (1996) 14 Cal.4th 605, 618–619 [experts may base their opinions " 'on reliable hearsay, including out-of-court declarations of other persons,' " and may " 'state on direct examination the reasons' " for their opinions].)

Defendant argues the recent United States Supreme Court opinion in *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221] rejected the reasoning of *People v. Thomas.* In *Williams,* a four-justice plurality of the court found the admission of "[o]ut of court statements that are related by the expert solely for the purpose of explaining the assumption on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." (*Id.* at p. ___ [132 S.Ct. at p. 2228].) In a concurring opinion, Justice Thomas found the statement at issue did not violate the confrontation clause as it lacked the requisite degree of solemnity and formality to be considered a testimonial statement, but rejected the plurality's reasoning that the statement was not offered for its truth. (*Id.* at p. ___ [132 S.Ct. at pp. 2255–2256] (conc. opn. of Thomas, J.).) In a dissenting opinion, four justices rejected the plurality's reasoning that the statement was not admitted for its truth, and further found the statement was testimonial within the meaning of *Crawford.* (*Williams v. Illinois, supra,* at p. ___ [132 S.Ct. at pp. 2268, 2274.] (dis. opn. of Kagan, J.).) We need not determine whether the remaining three contacts that were properly preserved for appeal violated the confrontation clause as it is clear the admission of that testimony was harmless beyond a reasonable doubt.

It is well settled that confrontation clause violations are subject to the federal harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Geier* (2007) 41 Cal.4th 555, 608, overruled on other grounds in *Melendez–Diaz v. Massachusetts* (2009) 557 U.S. 305.) It is the People's burden under *Chapman* to prove beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman, supra,* at p. 24.) " 'Since *Chapman,* we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' (*Delaware v. Van Arsdall* [ (1986) 475 U.S. 673,] 681.) The harmless error inquiry asks: 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' (*Neder v. United States* (1999) 527 U.S. 1, 18.)" (*People v. Geier, supra,* at p. 608; cf. *People v. Harrison* (2005) 35 Cal.4th 208, 239 [admission of statements in violation of *Crawford* requires reversal unless it can be found beyond a reasonable doubt that "the jury verdict would have been the same absent any error"].) "To say that an error did not contribute to the verdict is ... to find that error unimportant in relation to everything else the

jury considered on the issue in question, as revealed in the record." (*Yates v. Evatt* (1991) 500 U.S. 391, 403, disapproved on other grounds in *Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4.) We must undertake our own review of the record and determine what impact the evidence had "on the minds of an average jury." (*Harrington v. California* (1969) 395 U.S. 250, 254.) In conducting a harmless error review, we must look to the record as a whole. (*United States v. Hasting* (1983) 461 U.S. 499, 509.) In applying this standard, we find that any error in admitting the contested statements was harmless beyond a reasonable doubt.

Our Supreme Court has recently applied the *Chapman* harmless error standard in light of a claimed *Crawford* violation in *People v. Rutterschmidt* (2012) 55 Cal.4th 650. There the defendant was charged with two counts of murder, conspiracy to commit murder, and the special circumstances of multiple murder and murder for financial gain. (*Id.* at p. 656.) One of the theories relied upon by the prosecution was that the defendant drugged one of the victims prior to the killing. (*Id.* at p. 652.) To prove this, the prosecution presented evidence of a laboratory director who testified that an analysis of the victim's blood, performed at the laboratory by another analyst, indicated the presence of certain drugs. (*Id.* at pp. 652–656.) The California Supreme Court found it did not need to address whether the testimony violated the confrontation clause of the Sixth Amendment as any error in admitting the testimony was harmless beyond a reasonable doubt. (*Id.* at p. 661.) The court cited the overwhelming nature of the evidence against the defendant in finding the exclusion of the evidence would not have affected the outcome of the trial beyond a reasonable doubt. (*Ibid.*) We find *Rutterschmidt* instructive.

The issues presented at trial were whether defendant was in fact the person who shot the victim, whether the shooting was committed in self-defense or in the heat of passion, whether the killing was premeditated, and whether the shooting was for the benefit of the gang. We will consider each of these issues in turn.

The testimony relating to the three prior gang contacts had no bearing on whether defendant was the person who shot the victim. There is no question defendant was at the store moments before the shooting as he is seen on video both inside the store making a purchase and outside of the store getting into the passenger side of the red car. That it was defendant who committed the shooting was evident from his recorded statements admitting to both. Defendant stated he "murked a scrapa" in his conversation with Garcia. He admitted he used a "nine" to commit the crime, which corresponded with the nine-millimeter shell casing found at the scene. In addition, he admitted the murder to Salinas the morning after the crime, and Salinas noted that defendant and Lopez had two guns—a .357 and a nine-millimeter—with them. None of the challenged evidence went to the fact that defendant was the shooter. Thus, there can be no doubt that the verdict was not affected by the challenged evidence on this point.

The three contacts that defendant objected to, which occurred long before any events in the present case, had nothing to do with whether the killing was premeditated, in self-defense, or in the heat of passion as they did not address defendant's specific relationship with this victim.[9] Each of these contacts briefly recounted an assault between defendant and a rival gang member where defendant uttered gang slurs. Almost identical information was relayed to the jury through contact number 10, where defendant admitted to stealing a rival gang member's

---

[9] The description of the three contacts to which defendant objects occupies approximately three pages of the 600 pages of testimony in this case.

bicycle, simulated a weapon, uttered gang slurs, and admitted using his gang status to spread fear and intimidation. There was no objection to this evidence. The jury also heard, without objection, that defendant was involved in and admitted to a break-in at a school with Miranda and Basulto. This break-in was also gang related. Further, defendant was found near fresh gang graffiti in another contact and was found wearing gang colors in yet another gang contact. Thus the testimony was merely cumulative of other evidence before the jury.

Furthermore, the evidence could have had no bearing on the issue of self-defense, heat of passion, or premeditation under the specific facts of this case. There was overwhelming, uncontradicted evidence of the long-standing rivalry between the Norteno and Sureno street gangs. Detective Buhl testified that the rivalry between the gangs extended to the gangs' inception in the 1960's. Both Garcia and Buhl testified to the rivalry between the two and that each gang had the goal of eradicating the other. Even defendant pointed out this rivalry in making his claim of self-defense.[10] This rivalry, of course, provided a motive for the shooting in this case.

Moreover, it was quite clear at trial that there was a specific motive for the shooting. As both the prosecution and defense argued to the jury, the victim was perceived as being responsible for shooting at Lopez's mother's car shortly before the murder. This was a specific act of aggression by the victim, a Sureno gang member, against the Nortenos. It was this particular incident that was presented as both the basis of self-defense and the motive for the shooting. Defendant repeatedly brings up this prior incident in his taped conversation when discussing the murder.

In discussing their conversations with defendant, both Salinas and Garcia noted that the argument that preceded the shooting was not only gang related, but also related to the prior shooting of Lopez's mother's car. Garcia further explained that based on his conversation with defendant, the murder here was in retaliation for the prior shooting of Lopez's mother's car. Thus it is clear from the record any error in admitting cumulative nonspecific acts of gang violence could have had no impact on the findings of motive, premeditation, and self-defense or heat of passion by the jury.

Likewise, any error in admitting the evidence was also harmless beyond a reasonable doubt as to the special circumstance finding. First, we find overwhelming evidence that defendant was an active Norteno gang member and that the crime was committed for the benefit of the street gang. The record is replete with references to defendant's gang status, both from the witnesses and from defendant's own statements in the recorded conversation. Defendant admitted he was in gang files, he stated that he "murked a scrapa," and defendant was considered a fellow gang member by both Salinas and Garcia. Defendant sought out Garcia, a fellow gang member, for help in hiding from police even though he did not know Garcia. Garcia provided defendant with clothes and a place to stay because gang members are obligated to protect other members even if they do not know them or they are from other counties. Defendant had five gang-related tattoos, including two that announced the name of his gang. Defendant was wearing red, the color of his gang, at the time of the crime and was

---

[10] During closing argument, defense counsel argued as follows:
  "And you've learned a lot about south-siders and Nortenos during this trial. South-siders, [the victim's] gang, is an extremely violent gang, the most prevalent gang in the United States of America and their mission is to completely eradicate northerners."

with another active Norteno gang member. Moreover, Officer Jurado testified without objection that defendant was a Norteno gang member based on his numerous personal contacts with him. As the evidence of his gang membership was overwhelming, the complained-of contacts could have had no effect on the verdict.

While Detective Buhl did use these contacts in providing his opinion that defendant was a gang member, these were not the only bases of his opinion. There were numerous other contacts, not objected to, which formed the basis of his opinion in addition to defendant's gang tattoos, his gang clothing, and the circumstances of the crime.

Defendant's primary contention regarding prejudice is that the evidence of the three objected-to gang contacts were used as a basis for finding defendant knew members of the gang participated in a pattern of criminal activity. However, a close examination of the record demonstrates any error was harmless. By all accounts the primary purpose of the gang is to engage in criminal activity. First, Detective Buhl testified the primary purpose of the gang is to commit crimes, specifically, murder, attempted murder, arson, vehicle theft, narcotics trafficking, robbery, burglary, driveby shootings, and felony assault. To become a member of the gang, one must "put in work" by committing crimes for the gang. The detective recounted numerous instances where others committed crimes for the gang. This was further supported by Garcia, a former high-ranking gang member himself, who explained that in gang culture one has to "put in work, meaning you go find a rival gang member and ... you try to inflict violence towards them." In addition, he explained that the purpose of the gang is to do violence on the other gang. Indeed, the entire recorded conversation between defendant, Lopez and Garcia demonstrates the purpose of the gang is to commit crimes. Defendant repeatedly acknowledges his readiness to commit violence against rival gangs.

According to both Garcia and Detective Buhl, the gang is a very structured entity. Garcia testified that members have to abide by a code of conduct, and "if you want to be a northerner, ... you will abide by our rules and regulations or else we'll get rid of you." Gang members are expected to respond to violence with greater violence. Garcia further explained that being a part of a gang is a life style choice that includes making money selling drugs, showing colors, having noticeable tattoos, and being involved in a life of crime. "Going to jail, coming out, in and out, getting shot, going to funerals.... [S]elling drugs.... [¶] ... [¶] It's all for the gang." Garcia explained that members are indoctrinated that this is their cause and members have great pride in their gang. This sentiment was echoed in defendant's own words when he states:

> "All I know bro this time Im fuckin were they're at I pulled the trigger I told the homie the other homie I told that fool I'm sure homie don't trip this foo is going to get murked right homie fuck this nigga I was tired of these foos go to Avenal and we get popped hell each time these foo's aint fucking around with us.... [¶] Wrong with this bro. Im like if I let these motherfuckers run up again they're gonna fuck up our ride & fuck us I cant let that happen *I have heart homie.* Pah ... [¶] ... [¶] Pah ... I told his homie too I murk that nigga I murk that nigga and sure enough find out later on the homie's all texting me hey the home boy passed away...." (Italics added, some capitalization omitted.)

Based on the evidence produced, it is inconceivable that one could conclude defendant was a member of the gang yet have no knowledge that its members

"engage in or have engaged in a pattern of criminal gang activity." Defendant's closing argument contradicts such a finding. In attempting to argue it was not in fact defendant who committed the murder, counsel argued that he could have merely been boasting to Garcia to gain benefits within the gang and to "look tough. Tough to the head guy in Reedley." Such an argument demonstrates the strength of the evidence that defendant knew that members of the gang participate in a pattern of criminal activity. In addition, defendant's own words belie any argument that he did not know the gang members engaged in a pattern of criminal activity.

Defendant admitted to Garcia in the recorded conversation that he was in "gang files," which meant he was a validated gang member. He also admitted in his conversation that he had participated in gang activities previously. Defendant stated,

> "Im kool bro Im if anything I felt guitas about it's for the homie right here, *Ive been through shit like this already* (unaudible). [¶] ... [¶] I, I never been through shit like to fuckin fuckin getting caught on camera that's another thing homie *Ive done dirt already* Ive been done shit like that fuck camera thing nuh uh thats why I (inaudible) I was like fuck Im fucked this time man. Its like I really dont think about, I dont want to think about (inaudible)." (Italics added, some capitalization omitted.)

In addition to the overwhelming evidence recounted above, we note that the jury deliberated for only an hour and 11 minutes before reaching its verdict, again indicating the strength of the evidence. Considering the record as a whole, it is clear that the complained-of testimony did not contribute in any meaningful way to the issue of guilt. We are confident that any error was harmless beyond a reasonable doubt in light of such overwhelming evidence at trial.[11] (See *People v. Rutterschmidt, supra,* 55 Cal.4th at p. 661.)

*Madrigal*, 2013 WL 2450922, at *7–12 (footnotes in original).

Here, the California Court of Appeal found that any error in admitting the contested testimony regarding Petitioner's prior gang contacts was harmless beyond a reasonable doubt under the federal constitutional standard set forth in Chapman v. California, 386 U.S. 18 (1967). Under Chapman, "the test for determining whether a constitutional error is harmless . . . is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Neder v. United States, 527 U.S. 1, 15 (1999) (quoting Chapman, 386 U.S. at 24). The Supreme Court has held that when a state court's "Chapman decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the*

---

[11] Defendant goes on to argue that the admission of the evidence also violated his due process rights. As defendant acknowledges, however, he did not object to the testimony on due process grounds, thereby forfeiting the issue on appeal. (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1126, fn. 30.) Even if this court were to consider such a claim, we have already found that the admission of the evidence, even if in error, was harmless beyond a reasonable doubt.

1  *harmlessness determination itself* was unreasonable.'" Davis v. Ayala, 135 S. Ct. 2187, 2199

2  (2015) (quoting Fry v. Pliler, 551 U.S. 112, 119 (2007)). That is, Petitioner must show that the

3  state court's harmless error determination "was so lacking in justification that there was an error

4  well understood and comprehended in existing law beyond any possibility of fairminded

5  disagreement." Ayala, 135 S. Ct. at 2199 (internal quotation marks omitted) (quoting Richter,

6  562 U.S. at 103).

7       Petitioner argues that the prior gang contacts were evidence of unprovoked aggression

8  that negated his claim of self-defense. (ECF No. 33 at 11). At trial the defense argued, *inter alia*,

9  that Petitioner was acting in self-defense based on the theory that Petitioner knew the victim was

10  a Sureno gang member who had recently shot up Lopez's mother's car and thus had access to a

11  firearm, loud and angry words were exchanged at the Circle K, and the victim called a large

12  group of Surenos to come. (9 RT 2085–88).

13       Excluding the prior gang contacts, the evidence admitted at trial clearly established that

14  Petitioner was a Norteno gang member, there was a long-standing rivalry between the Nortenos

15  and Surenos, and gang members are expected to respond to a rival gang's violence with greater

16  violence. Both Salinas and Garcia considered Petitioner to be a Norteno gang member, and

17  Officer Jurado testified, on the basis of his numerous personal contacts with Petitioner, that

18  Petitioner was a Norteno gang member. (6 RT 1106–07, 1175–77; 7 RT 1460, 1465). Detective

19  Buhl testified about the long history of the Norteno-Sureno rivalry and that if a gang commits an

20  offense against a rival gang, the rival gang must retaliate with equal or greater force. (6 RT

21  1260–61, 1306–08). Garcia testified that the appropriate retaliation for shooting up a car would

22  be murder. (7 RT 1463). Salinas also testified that the appropriate retaliation for shooting up a

23  car would be "[t]o shoot their house up or take their lives away." (6 RT 1223).

24       Additionally, the jury heard evidence pertinent to Petitioner's self-defense theory. Salinas

25  testified that Petitioner told him that a Sureno "started like tripping off . . . started telling him

26  stuff," that they had an argument about Surenos shooting up Christian Lopez's mother's car a

27  week and a half earlier, and that the victim was trying to call more Surenos to the scene. (6 RT

28  ///

1184, 1192–94, 1215–16). Similarly in the recorded conversation,[12] Petitioner told Garcia that: the victim shot up Lopez's mother's car two weeks prior; the incident began because the victim was "wolfing" or "talking shit"; the victim tried to engage in battle and called a group of Surenos; and six people arrived just before the shooting. (7 RT 1461–69; 1 CT 198, 201–02).

Based on the foregoing, the state court reasonably concluded that given the strength of the other evidence introduced at trial and the fact that the jury deliberated for only an hour and eleven minutes before reaching a verdict, Petitioner's gang contacts were merely cumulative of other gang-related evidence and did not prejudicially impact the jury's verdict. The California Court of Appeal's harmless error determination was not contrary to, or an unreasonable application of, Chapman. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his first and second claims and they should be denied.

### B.  Cesar Garcia's Testimony

In his third claim for relief, Petitioner asserts that his due process and Fourth Amendment rights were violated when the trial court did not exclude the transcript and testimony of confidential informant Cesar Garcia, who gave drugs and alcohol to Petitioner and then elicited incriminating statements. (ECF No. 33 at 42). Respondent argues that this claim is procedurally barred, and in any event, fails on the merits. (ECF No. 38 at 36).

Petitioner raised this claim challenging Garcia's testimony in his first round of state habeas petitions. The Kings County Superior Court denied the claim on procedural grounds. (LD 23). The California Court of Appeal, Fifth Appellate District denied the claim with citation to In re Sterling, 63 Cal. 2d 486, 487 (Cal. 1965), and In re Lindley, 29 Cal. 2d 709, 723 (Cal. 1947). (LD 25). Finally, the California Supreme Court denied the claim with citation to In re Dixon, 41 Cal. 2d 756, 759 (Cal. 1953). (LD 27).

///

---

[12] The Court notes that Petitioner challenges the constitutionality of admitting this recording and Garcia's testimony of the conversation. As discussed in more detail in sections IV(B)(2) and IV(C)(2)(b), *infra*, Petitioner is not entitled to habeas relief based on the admission of the recording and Garcia's testimony.

1    As federal courts review the last reasoned state court opinion, the Court will examine the

2    decision of the California Supreme Court. See Ylst, 501 U.S. at 802 (defining an unexplained

3    order as one "whose text or accompanying opinion does not disclose the reason for the

4    judgment"); Curiel v. Miller, 830 F.3d 864, 870 (9th Cir. 2016) (en banc) ("We have no cause to

5    treat a state court's summary order with citations as anything but a 'reasoned' decision, provided

6    that the state court's references reveal the basis for its decision.").

7        1.  Procedural Default

8        A federal court will not review a petitioner's claims if the state court has denied relief on

9    those claims pursuant to a state law procedural ground that is independent of federal law and

10   adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 729–30 (1991). This

11   doctrine of procedural default is based on the concerns of comity and federalism. Id. at 730–32.

12   However, there are limitations as to when a federal court should invoke procedural default and

13   refuse to review a claim because a petitioner violated a state's procedural rules. Procedural

14   default can only block a claim in federal court if the state court "clearly and expressly states that

15   its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989).

16       Here, the California Supreme Court denied Petitioner's habeas petition with a citation to

17   Dixon. (LD 27). Under the Dixon rule, a petitioner cannot raise a claim in a post-appeal habeas

18   petition when that claim was not, but could have been, raised on direct appeal. Dixon, 41 Cal. 2d

19   at 759. As the California Supreme Court clearly and expressly stated that its judgment rests on a

20   state procedural bar, procedural default is appropriate if the Dixon rule is independent and

21   adequate.

22       To qualify as "independent," a state procedural ground "must not be 'interwoven with the

23   federal law.'" Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting Michigan v.

24   Long, 463 U.S. 1032, 1040–41 (1983)). Prior to In re Robbins, 18 Cal. 4th 770 (Cal. 1998),

25   denials of California state habeas petitions for Dixon violations were not independent of federal

26   law. Park, 202 F.3d at 1152. Although the Ninth Circuit has not explicitly held that post-Robbins

27   denials for Dixon violations are independent, the Ninth Circuit has noted that "[t]he California

28   Supreme Court has adopted in Robbins a stance from which it will now decline to consider

federal law when deciding whether claims are procedurally defaulted." <u>Park</u>, 202 F.3d at 1152. "The purpose of this approach was to establish the adequacy and independence of the State Supreme Court's future <u>Dixon</u>/<u>Robbins</u> rulings . . . ." <u>Id.</u> at 1152 n.4. Relying on the on the <u>Dixon</u>/<u>Robbins</u> analysis in <u>Park</u>, the Ninth Circuit subsequently held that the California Supreme Court's denial of a state habeas petition for untimeliness based on <u>Robbins</u> and <u>In re Clark</u>, 5 Cal. 4th 750 (Cal. 1993), is an independent procedural ground. <u>Bennett v. Mueller</u>, 322 F.3d 573, 582 (9th Cir. 2003). Pursuant to <u>Park</u> and <u>Bennett</u>, the Court finds that the California Supreme Court's post-<u>Robbins</u> denial of Petitioner's state habeas petition for a <u>Dixon</u> violation is an independent state procedural ground.

"To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'" <u>Walker v. Martin</u>, 562 U.S. 307, 316 (2011) (quoting <u>Beard v. Kindler</u>, 558 U.S. 53, 60 (2009)). The Supreme Court has held that the <u>Dixon</u> rule "qualifies as adequate to bar federal habeas review." <u>Johnson v. Lee</u>, 136 S. Ct. 1802, 1806 (2016). Accordingly, the Court finds that the California Supreme Court expressly invoked an independent and adequate procedural rule in California, commonly referred to as the <u>Dixon</u> rule, and Petitioner has procedurally defaulted this claim.

A petitioner "may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." <u>Martinez v. Ryan</u>, 132 S. Ct. 1309, 1316 (2012) (citing <u>Coleman</u>, 501 U.S. at 750). Attorney error on direct appeal constituting ineffective assistance of counsel provides "cause" to excuse procedural default. <u>Martinez</u>, 132 S. Ct. at 1317; <u>Coleman</u>, 501 U.S. at 754. However, a claim of ineffective assistance generally must "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." <u>Murray v. Carrier</u>, 477 U.S. 478, 489 (1986). Here, Petitioner states that ineffective assistance of appellate counsel caused the default, but Petitioner has not properly presented an independent ineffective assistance of appellate counsel claim to the state courts.[13]

---

[13] In his second state habeas petition in the California Supreme Court, Petitioner raised only one claim, which was ineffective assistance of trial counsel for failing to properly prepare defenses regarding Garcia's testimony, Petitioner's confession, and the prosecution's evidence of Petitioner's prior gang contacts. (LD 28). However, the Court notes that Petitioner explained in the state habeas petition that he did not raise the claim earlier due to the failure of appellate counsel.

1   (ECF No. 43 at 5). As Petitioner has failed to establish cause and prejudice for his default, the

2   Court finds that Petitioner is procedurally barred from bringing this claim and it should be

3   dismissed. In any case, Petitioner's claim is without merit.

4        2.   Merits Analysis

5             a.   **Voluntariness of Confession**

6        Petitioner contends that his constitutional rights were violated when confidential

7   informant Cesar Garcia plied Petitioner with drugs and alcohol and then elicited incriminating

8   statements. (ECF No. 33 at 42). The Due Process Clause of the Fourteenth Amendment requires

9   confessions to be voluntary in order to be admitted into evidence. Dickerson v. United States,

10  530 U.S. 428, 433 (2000). The due process voluntariness test "examines 'whether a defendant's

11  will was overborne' by the circumstances surrounding the giving of a confession" and "takes into

12  consideration 'the totality of all the surrounding circumstances—both the characteristics of the

13  accused and the details of the interrogation.'" Id. at 434 (quoting Schneckloth v. Bustamonte,

14  412 U.S. 218, 226 (1973)). In sum, the voluntariness "determination 'depend[s] upon a weighing

15  of the circumstances of pressure against the power of resistance of the person confessing.'"

16  Dickerson, 530 U.S. at 434 (quoting Stein v. New York, 346 U.S. 156, 185 (1953)).

17       Petitioner claims that his confession was involuntary because he was under the influence

18  of alcohol and drugs. At a hearing held outside the presence of the jury on the defense's motion

19  in limine, Garcia testified that although he offered to purchase beer, Petitioner did not want any

20  and Garcia did not give alcohol to Petitioner. (7 RT 1410, 1412). Garcia also testified that

21  although he possessed marijuana at the time and brought it to the group so they could smoke, he

22  could not recall actually handing the marijuana to Petitioner. (7 RT 1416). Garcia testified that in

23  his opinion, Petitioner was "sober and clear minded" and was not intoxicated or impaired. (7 RT

24  1420, 1421). At trial, Garcia testified that Petitioner did not accept any marijuana when it was

25  offered. (7 RT 1450). Even if Petitioner were under the influence of alcohol or drugs, that alone

26  does not prove involuntariness; intoxication is one factor to consider in the totality of the

27  circumstances. See United States v. Banks, 282 F.3d 699, 706 (9th Cir. 2002) ("A confession

28  made in a drug or alcohol induced state . . . may be deemed voluntary if it remains 'the product

1   of a rational intellect and a free will . . . .'"") (quoting <u>Medeiros v. Shimoda</u>, 889 F.2d 819, 823

2   (9th Cir. 1989)), <u>rev'd on other grounds</u>, 540 U.S. 31 (2003). Upon review of the state court

3   record, including the recorded conversation, the Court finds that the record does not establish

4   that Petitioner's confession was involuntary.

5                         **b.  Fourth Amendment**

6            Petitioner contends that his Fourth Amendment rights were violated when confidential

7   informant Garcia secretly recorded Petitioner without a warrant or Petitioner's permission. (ECF

8   No. 33 at 45). The Supreme Court has held that "where the State has provided an opportunity for

9   full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal

10  habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure

11  was introduced at his trial." <u>Stone v. Powell</u>, 428 U.S. 465, 494 (1976). <u>See</u> <u>Newman v.</u>

12  <u>Wengler</u>, 790 F.3d 876, 881 (9th Cir. 2015) (noting <u>Stone</u> survived enactment of the AEDPA).

13  The only inquiry a federal habeas court can make is whether Petitioner had a full and fair

14  opportunity to litigate his claim. <u>See</u> <u>Ortiz-Sandoval v. Gomez</u>, 81 F.3d 891, 899 (9th Cir. 1996)

15  ("The relevant inquiry is whether petitioner had the opportunity to litigate his claim, not whether

16  he did, in fact, do so, or even whether the claim was correctly decided.") (citations omitted).

17           In this case, Petitioner's Fourth Amendment claim could have been litigated in the state

18  trial court, but defense counsel improperly raised the issue on the second day of trial during her

19  request for a 402 hearing.[14] The trial court agreed with the prosecution's assertion that a 402

20  hearing was not the proper procedure to litigate the Fourth Amendment issue and that the

21  defense should have filed a motion beforehand. (4 RT 518–20). The Court finds that the state

22  court provided Petitioner with a "full and fair opportunity to litigate" his Fourth Amendment

23  claim, even though he did not in fact do so. <u>Stone</u>, 428 U.S. at 494. <u>See</u> <u>Gordon v. Duran</u>, 895

24  F.2d 610, 613–14 (9th Cir. 1990) (holding that the availability to file a suppression motion

25

26  ---
    [14] California Evidence Code section 402(b) provides:
27            The court may hear and determine the question of the admissibility of evidence out of the presence or
              hearing of the jury; but in a criminal action, the court shall hear and determine the question of the
              admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if
28            any party so requests.

                                    25

pursuant to California Penal Code section 1538.5[15] provided opportunity in state court for full and fair litigation of Fourth Amendment claim).

Based on the foregoing, Petitioner is not entitled to habeas relief on his third claim, and it should be denied.

## C. Ineffective Assistance of Counsel

In his fourth claim for relief, Petitioner asserts that trial counsel was ineffective for: failing to adequately challenge and properly object to the admission of Petitioner's statement to Cesar Garcia, due to Petitioner's intoxication and the manner in which the conversation was recorded, and failing to sufficiently contest the prosecution's evidence of Petitioner's prior gang contacts. (ECF No. 33 at 42, 47–48). Respondent argues that this claim is procedurally barred, and in any event, fails on the merits. (ECF No. 38 at 42). Petitioner raised this ineffective assistance of counsel claim in his second state habeas petition in the California Supreme Court, which denied the claim with citation to In re Robbins, 18 Cal. 4th 770, 780 (Cal. 1998), and In re Clark, 5 Cal. 4th 750, 767–69 (Cal. 1993). (LD 29).

1. Procedural Default

As discussed above, a federal court will not review a petitioner's claims if the state court has denied relief on those claims pursuant to a state law procedural ground that is independent of federal law and adequate to support the judgment. Coleman, 501 U.S. at 729–30. Here, the California Supreme Court denied Petitioner's habeas petition with citation to Robbins and Clark. (LD 29). Citation to Robbins refers to California's timeliness requirement for state habeas

---

[15] California Penal Code section 1538.5 provides in pertinent part:

(a) (1) A defendant may move for the return of property or to suppress as evidence any tangible or intangible thing obtained as a result of a search or seizure on either of the following grounds:

(A) The search or seizure without a warrant was unreasonable.

(B) The search or seizure with a warrant was unreasonable because any of the following apply:

(i) The warrant is insufficient on its face.

(ii) The property or evidence obtained is not that described in the warrant.

(iii) There was not probable cause for the issuance of the warrant.

(iv) The method of execution of the warrant violated federal or state constitutional standards.

(v) There was any other violation of federal or state constitutional standards.

(2) A motion pursuant to paragraph (1) shall be made in writing and accompanied by a memorandum of points and authorities and proof of service. The memorandum shall list the specific items of property or evidence sought to be returned or suppressed and shall set forth the factual basis and the legal authorities that demonstrate why the motion should be granted.

petitions. <u>Clark</u> discusses several procedural bars used by California courts, and the pages cited here by the California Supreme Court refer to the bar on successive petitions. As the California Supreme Court clearly and expressly stated that its judgment rests on state procedural bars, procedural default is appropriate if the timeliness or successive petition rule is independent and adequate.

The Ninth Circuit has held that California's timeliness rule for state habeas petitions is not interwoven with federal law and therefore constitutes an independent procedural ground. <u>See</u> <u>Martin</u>, 562 U.S. at 315 (citing <u>Bennett</u>, 322 F.3d at 582–83). The Supreme Court has held that the timeliness rule is firmly established, regularly followed, and therefore constitutes an adequate procedural ground. <u>Martin</u>, 562 U.S. at 317–22. Accordingly, the Court finds that the California Supreme Court expressly invoked the timeliness bar, an independent and adequate procedural rule, and Petitioner has procedurally defaulted this claim.

A petitioner "may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." <u>Martinez</u>, 132 S. Ct. at 1316 (citing <u>Coleman</u>, 501 U.S. at 750). Attorney error on direct appeal constituting ineffective assistance of counsel provides "cause" to excuse procedural default. <u>Martinez</u>, 132 S. Ct. at 1317; <u>Coleman</u>, 501 U.S. at 754. However, a claim of ineffective assistance generally must "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." <u>Carrier</u>, 477 U.S. at 489. Here, Petitioner states that ineffective assistance of appellate counsel caused the default, but Petitioner has not properly presented an independent ineffective assistance of appellate counsel claim to the state courts. (ECF No. 43 at 6). As Petitioner has failed to establish cause and prejudice for his default, the Court finds that Petitioner is procedurally barred from bringing this claim and it should be dismissed. In any event, Petitioner's claim is without merit.

2. <u>Merits Analysis</u>

### a. **Legal Standard**

The clearly established federal law governing ineffective assistance of counsel claims is <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). In a petition for writ of habeas corpus alleging

ineffective assistance of counsel, the court must consider two factors. Strickland, 466 U.S. at 687. First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Richter, 562 U.S. at 105 ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.") (citing Strickland, 466 U.S. at 690). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 687. A reviewing court should make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time." Id. at 689.

Second, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A court "asks whether it is 'reasonable likely' the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 111–12 (citing Strickland, 466 U.S. at 696, 693). A reviewing court may review the prejudice prong first. See Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002).

### b.  Failure to Prepare Effective Defense Regarding Petitioner's Intoxication

Petitioner asserts that his trial counsel was ineffective for failing to prepare an effective defense regarding Petitioner's intoxication during his recorded confession. Petitioner contends that counsel should have hired an expert to testify regarding the possible effects of drugs and alcohol on Petitioner's physical and mental condition when he gave the incriminating statements. (ECF No. 33 at 48).

Here, trial counsel moved to exclude Petitioner's confession, arguing that it was involuntary due to Petitioner's intoxication. (7 RT 1405). The motion was denied based on Garcia's testimony at the 402 hearing. (7 RT 1421–22). At trial, defense counsel attacked Garcia's credibility during cross-examination. Counsel questioned Garcia about Detective Kyle Kramer telling him that he could not give someone alcohol, marijuana, or drugs to elicit statements. (7 RT 1497). Counsel then reviewed a transcript of the recording with Garcia, directing his attention to the multiple instances in which Garcia discussed and offered alcohol and drugs to the group. (7 RT 1498–1502). Garcia admitted that he was encouraging people to smoke marijuana. (7 RT 1502). Additionally, defense counsel raised Garcia's criminal history, his influential status in the Norteno gang in Reedley, and the benefits he received by cooperating with law enforcement (e.g., money for fuel, a storage unit, rent, groceries, hygiene products, and getting a parole hold lifted for a drunk driving arrest). (7 RT 1483, 1486–90, 1513–15). Furthermore, trial counsel repeated these attacks during closing argument. She argued that the jury should not be fooled by Garcia, who is a convicted felon, and emphasized the drinking and smoking that was going on during the recorded conversation, in clear violation of the governmental rules. (9 RT 2080, 2082). Counsel directed the jury's attention to the fact that Garcia had never met Petitioner and Christian Lopez before, did not remember their names, and there was no independent corroboration that Garcia accurately attributed the words in the recording to Petitioner and Lopez. (9 RT 2082–83). Moreover, having an expert testify to the possible effects of drugs and alcohol would contradict the defense's trial strategy of attacking the credibility of Garcia and questioning his ability to correctly recall what occurred that day, including whether the incriminating statements could even be attributed to Petitioner. See Correll v. Stewart, 137 F.3d 1404, 1411 (9th Cir. 1998) (holding counsel was not ineffective for failing to present psychiatric evidence that would have contradicted the primary defense theory of misidentification).

The Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and based on the foregoing, Petitioner has failed to overcome that presumption. Strickland, 466 U.S. at 689. Accordingly, Petitioner is not

1   entitled to habeas relief for ineffective assistance of counsel on the ground that trial counsel

2   failed to prepare an effective defense regarding Petitioner's intoxication during his recorded

3   confession.

### c.   Failure to Properly Litigate Fourth Amendment Issue

5       Petitioner also asserts that trial counsel was ineffective for failing to properly object to

6   admission of Garcia's testimony on Fourth Amendment grounds. In order to establish ineffective

7   assistance of counsel based on defense counsel's failure to litigate a fourth Amendment issue, a

8   petitioner must show that: (1) the overlooked motion to suppress would have been meritorious,

9   and (2) there is a reasonable probability that the jury would have reached a different verdict

10  absent introduction of the unlawful evidence. Ortiz-Sandoval v. Clarke, 323 F.3d 1165, 1170

11  (9th Cir. 2003). See also Styers v. Schriro, 547 F.3d 1026, 1030 n.5 (9th Cir. 2008) ("Generally,

12  a defendant claiming ineffective assistance of counsel for failure to file a particular motion must

13  not only demonstrate a likelihood of prevailing on the motion, but also a reasonable probability

14  that the granting of the motion would have resulted in a more favorable outcome in the entire

15  case.").

16      The Supreme Court's Fourth Amendment jurisprudence requires courts to ask (1)

17  "whether the individual, by his conduct, has exhibited an actual expectation of privacy," and (2)

18  "whether the individual's expectation of privacy is 'one that society is prepared to recognize as

19  reasonable.'" Bond v. United States, 529 U.S. 334, 338 (2000) (quoting Smith v. Maryland, 442

20  U.S. 735, 740 (1979)). The Supreme Court has held that a suspect generally has no privacy

21  interest protected by the Fourth Amendment when he voluntarily confides to a government agent

22  on a "misplaced confidence that [the agent] would not reveal his wrongdoing." Hoffa v. United

23  States, 385 U.S. 293, 300–02 (1966). Additionally, the government agent may make audio

24  recordings of the suspect's statements, and those recordings do not require a warrant. United

25  States v. White, 401 U.S. 745, 749–51 (1971) (plurality opinion). See also United States v.

26  Wahchumwah, 710 F.3d 862, 867 (9th Cir. 2013). Given that any motion to suppress based on

27  Garcia's warrantless recording of his conversation with Petitioner would not have been

28  meritorious, the Court finds that Petitioner is not entitled to habeas relief for ineffective

1 | assistance of counsel on the ground that trial counsel failed to properly raise and litigate the
2 | Fourth Amendment issue.

3 | **d. Failure to Sufficiently Contest Evidence of Petitioner's Gang Contacts**

4 | Petitioner asserts that trial counsel was ineffective for failing to object to all of
5 | Petitioner's gang contacts and for not adequately preparing a defense for the contacts that were
6 | presented to the jury. Petitioner contends that trial counsel should have sent investigators to
7 | question the declarants of the gang contacts and specifically to get a statement from his mother
8 | regarding an incident in which Petitioner slapped his mother and wielded an aluminum bat at her
9 | for speaking to a rival gang member's mother about a bicycle that was stolen from Petitioner.
10 | (ECF No. 33 at 47–48).

11 | At trial, the jury heard testimony regarding gang contact numbers 2, 3, 5, 6, 10, 11, and
12 | 12. (7 RT 1538–46). See Madrigal, 2013 WL 2450922, at *7–8 (summarizing Petitioner's gang
13 | contacts). Contact numbers 2, 5, 6, and 11 involved victim statements to law enforcement
14 | officers. Defense counsel objected to contact numbers 5, 6, and 11 as layered hearsay, citing to
15 | Crawford v. Washington, 541 U.S. 36 (2004). (7 RT 1530). The trial court overruled the
16 | objections. (7 RT 1531–32). Contact numbers 3 and 12 involved law enforcement officers'
17 | personal observations of Petitioner's conduct. Contact number 10 involved Petitioner's statement
18 | to arresting officers.

19 | The Court "must indulge a strong presumption that counsel's conduct falls within the
20 | wide range of reasonable professional assistance; that is, the defendant must overcome the
21 | presumption that, under the circumstances, the challenged action 'might be considered sound
22 | trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101
23 | (1955)). As noted by the California Court of Appeal, one tactical reason for not objecting to
24 | contacts 2, 3, 10, and 12 and for allowing all the gang contacts to be admitted through Detective
25 | Buhl would be to draw less attention to this evidence. See Madrigal, 2013 WL 2450922, at *14.
26 | By not requiring the prosecution to call each of the various officers who made the personal
27 | observations of these gang contacts or to whom Petitioner made his prior statements, by not
28 | devoting a substantial amount of time to contest the details of the contacts, and by not

compelling Petitioner's mother to potentially testify against him at trial, defense counsel was able to prevent the gang contacts from being unduly emphasized at trial. In fact, Buhl's testimony of Petitioner's gang contacts constituted approximately nine pages of the almost six hundred pages of trial testimony. (7 RT 1538–46). Petitioner has failed to overcome the presumption that counsel's action might be considered sound trial strategy.

Additionally, Petitioner does not establish "there is a reasonable probability that . . . the result of the proceeding would have been different." Strickland, 466 U.S. at 694. As discussed in section IV(A), *supra*, admitting evidence of cumulative nonspecific acts of gang violence and crime would not have a prejudicial impact on the jury's verdict in light of the strength of the other evidence introduced at trial. This conclusion is supported by the fact that the jury deliberated for only an hour and eleven minutes before reaching a verdict. Accordingly, the Court finds that Petitioner is not entitled to habeas relief for ineffective assistance of counsel on the ground that trial counsel failed to adequately contest evidence of Petitioner's gang contacts.

Based on the foregoing, Petitioner is not entitled to habeas relief on his fourth claim, and it should be denied.

## V.

## RECOMMENDATION

Accordingly, the Court HEREBY RECOMMENDS that the amended petition for writ of habeas corpus (ECF No. 33) be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may

waive the right to appeal the District Court's order. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **December 21, 2016**

UNITED STATES MAGISTRATE JUDGE